IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

     Plaintiff,

  Vs.           No.  05-40148-01-SAC

TERRY L. RICHARDS,

     Defendant.

MEMORANDUM AND ORDER

   The case comes before the court on the defendant's pretrial motion to suppress the evidence found during the search and seizure of his person on August 29, 2005.  (Dk. 15).  The defendant challenges the initial traffic stop as an unlawful seizure and the attempted pat-down of his person during the stop as an unlawful search.  The government has filed a response opposing the motion. (Dk. 18).  At the hearing held on March 8, 2006, the court heard the testimony of Officer Bobby Ming with the Topeka Police Department and received a digital photo of the traffic stop area.  After the defendant supplemented his memorandum with the case of *United States v. Parker*, 214 F. Supp. 2d 770 (E.D. Mich. 2002), the parties

submitted the matter for decision on their briefs and the evidence.  Having reviewed

the pleadings and evidence received and having researched the relevant law, the

court is ready to rule on the motion.

**INDICTMENT**

In a two-count indictment, the defendant Terry L. Richards is

separately charged with possession of a firearm and with possession of ammunition

on August 29, 2005, following felony convictions in violation of 18 U.S.C. §

922(g)(1).

**FACTS**

Topeka Police Officer Bobby Ming was working the night shift-- 11:00

p.m. to 7:00 a.m.--on August 28 and 29, 2005, when he received a radio

transmission at 12:45 a.m. that there had been an armed robbery of a cab driver

near a convenience store at 17th and Topeka.  The information provided on the

armed robbery identified the suspects as three black males who had used a nine-

millimeter handgun.  Other reported details were that the cab driver had picked up

the suspects in the 2400 block of Madison, that the suspects had fled the robbery

scene heading northeast, and that the suspects were connected with a dark color

Cadillac.

Officer Ming answered a call to check the 2400 block of Madison for

2

a car matching this description, but he did not see such a car which could have been used in the reported robbery.  After completing this call, Officer Ming returned to his patrol zone and parked his patrol car in the north lot of the Boy's and Girl's Club in the 2600 block of Adams Street.  Positioning his car and opening his car window so as to view and hear traffic on Adams Street, he began to work on several reports and eat a meal.

        Minutes later, at approximately 1:05 a.m., Officer Ming's attention was drawn to the loud exhaust sound of a vehicle accelerating uphill on Adams Street.  He noticed the vehicle was an older and dark-greyish-blue Cadillac coming from the north side of town and traveling at a high rate of speed, well in excess of the speed limit.  Officer Ming is a certified radar operator and required to estimate vehicle speeds correctly within a range of five miles per hour.  The Cadillac was the only vehicle he saw operating on Adams Street.  Officer Ming indicated there typically is little traffic along Adams Street on Sunday morning at 1:05 a.m.  He immediately pursued the Cadillac and radioed for backup.  Though able to see several occupants in the vehicle, he was not able to determine their age or race.  He quickly caught up with the Cadillac and noticed it weave between lanes without signaling and without completing any lane change.  Officer Ming stopped behind the Cadillac at the traffic light at 29th and Adams Street.  Based on the operation of the Cadillac

3

and the behavior of its occupants, Officer Ming believed they were aware he was

following them.

        Because this Cadillac appeared to match the description of the vehicle

used less than an hour ago in an armed robbery, Officer Ming described this as a

"high adrenalin" situation about which he was seriously concerned for the safety of

himself and any other officers involved in the stop.  Learning that a backup unit was

nearby, Officer Ming waited until the traffic light at 29th and Adams Street changed

then followed the Cadillac through the intersection and activated his emergency

lights.  Instead of pulling over promptly, the Cadillac slowed, pulled closer to the

curb, and idled along the curb for nearly forty yards.  Officer Ming testified this

driving maneuver made him suspicious that the Cadillac's occupants could be

drinking, hiding evidence of illegal conduct, accessing weapons, or preparing to

flee.  Officer Ming further testified that his apprehension about the danger of this

traffic stop was heightened because of this driving maneuver.

        Once the Cadillac stopped, Officer Ming waited until backup arrived

on the scene before approaching.  Officer Ming testified that he considered

employing the high-risk felony-stop procedure, but decided instead to do

everything just short of this procedure as he still did not know the age and sex of

the occupants.  With his flashlight on and his handgun out and its safety off,

Officer Ming walked forward and observed at least four black males inside the Cadillac.  For his protection, he positioned himself slightly behind the rear window pillar so that no occupant could shoot at him without first turning around and the occupant's movement being seen by him.  Officer Ming testified that he wanted to keep everybody calm until more officers were present.

From this safer position near the rear of the car, Officer Ming identified himself to the driver, explained the purpose of the stop, requested paperwork, and asked the driver to step to the rear of the car.  The driver complied with these requests, and the officer explained that he had stopped them for speeding and to check out a recent robbery.  Officer Ming frisked the driver for weapons after getting his permission.  Finding no weapon, Officer Ming asked the driver to sit on the curb in proximity to the officer serving as backup.  He then went around to the passenger side of the Cadillac and asked the front seat passenger to join him at the rear of the car.

The passenger seated in the front was later identified as Terry Richards, the defendant in this case.  Officer Ming described the defendant as hesitant and reluctant to comply with his requests.  As Richards emerged from the car, the defendant began questioning the officer over the purpose and need for the stop.  Officer Ming immediately noticed that Richards was a large person.

5

Concerned for his safety and hoping to defuse the tension, Officer Ming calmly asked Richards to place his hands on the trunk.  The defendant hesitated but after a few seconds he leaned over the trunk.  Following his pat-down procedure, Officer Ming first placed one hand lightly on the defendant's back for safety reasons.  With this hand in place, Officer Ming testified that he can sense when a person is becoming uncooperative.  As Officer Ming started to reach forward to sweep the defendant's front waist band, Richards spun around and Ming tried to grab and control the defendant.  With his grabbing hand, Officer Ming felt the butt of a handgun protruding from the defendant's waist band.  Officer Ming quickly stepped back to draw his weapon, but when his heels caught the curb he nearly fell over.

The defendant began running northwest towards a dark wooded area. Officer Ming pursued the defendant shouting at him to stop and radioing for additional backup.  When the defendant reached the trees, Officer Ming stopped his pursuit and positioned himself behind a tree.  Additional officers arrived on the scene, and the defendant was eventually arrested in the woods.  Officers also found a handgun, baggies, and drugs in the woods and a loaded magazine in the defendant's pants pocket.

**LAWFULNESS OF STOP**

6

The defendant's motion challenges the lawfulness of the initial stop arguing it was not supported by reasonable suspicion that the Cadillac or its occupants were involved with the armed robbery or that the Cadillac had been operated in violation of one or more traffic laws.  A traffic stop is a seizure under the Fourth Amendment.  *United States v. Taverna*, 348 F.3d 873, 877 (10th Cir. 2003).  Akin to investigative detentions, routine traffic stops are analyzed under the investigative detention principles outlined in *Terry v. Ohio*, 392 U.S. 1 (1968). *United States v. Hunnicutt*, 135 F.3d 1345, 1348 (10th Cir. 1998).  The reasonableness of a traffic stop is a dual inquiry: (1) "whether the officer's action was justified at its inception," and (2) whether the officer's action "was reasonably related in scope to the circumstances that first justified the interference."  *United States v. Burch*, 153 F.3d 1140, 1141 (10th Cir. 1998) (quotation omitted).

In deciding the validity of the initial stop, the court looks at whether it was "objectively justified."  *United States v. Botero-Ospina*, 71 F.3d 783, 788 (10th Cir. 1995) (en banc), *cert. denied*, 518 U.S. 1007 (1996).  To be valid, the officer must have either "'(1) probable cause to believe a traffic violation has occurred, or (2) a reasonable articulable suspicion that this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction.'"  *United States v. Zubia-Melendez*, 263 F.3d 1155, 1160 (10th

7

Cir. 2001) (quoting *United States v. Ozbirn*, 189 F.3d 1194, 1197 (10th Cir. 1999)).  The constitutional reasonableness of a traffic stop does not depend on the officer's actual motive in conducting the stop.  *Whren v. United States*, 517 U.S. 806, 812-13 (1996).  In short, the initial traffic stop is reasonable if the officer observed a traffic violation or has reasonable articulable suspicion that a traffic or equipment violation occurred.  *United States v. Nichols*, 374 F.3d 959, 964 (10th Cir. 2004), *cert. granted and vacated*, 125 S. Ct. 1082 (U.S. 2005), *opinion affirming conviction reinstated*, 410 F.3d 1186 (10th Cir. 2005).

The Tenth Circuit recently summarized the law relevant to the reasonable suspicion standard to be applied in the context of traffic stops:

> Reasonable suspicion requires that an officer provide "some minimal level of objective justification."  *I.N.S. v. Delgado*, 466 U.S. 210, 217, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984).  However, an officer with reasonable suspicion need not "rule out the possibility of innocent conduct" as long as the totality of the circumstances suffices to form "a particularized and objective basis" for a traffic stop.  *United States v. Arvizu*, 534 U.S. 266, 277-78, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (citation omitted). Moreover, reasonable suspicion may be supported by an "objectively reasonable" good faith belief even if premised on factual error.  *See United States v. Walraven*, 892 F.2d 972, 974-75 (10th Cir. 1989) (quotation omitted).  Finally, reasonable suspicion may rely on information less reliable than that required to show probable cause, *Alabama v. White*, 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990), and it need not be correct.  *See United States v. Callarman*, 273 F.3d 1284, 1287 (10th Cir. 2001) (upholding a traffic stop based on a reasonable articulable suspicion that a cracked windshield substantially obstructed the driver's view--the standard required by statute-- regardless of whether or not the crack actually constituted a violation of the

law); *United States v. Allegree*, 175 F.3d 648, 650 (8th Cir. 1999) (upholding a traffic stop based on the mistaken, yet reasonable, belief that defendant had illegal headlights).

*United States v. Vercher*, 358 F.3d 1257, 1261 (10th Cir. 2004).

As a certified operator of a radar detector capable of correctly estimating vehicle speeds within five miles per hour of their actual speed, Officer Ming had reasonably suspicion to stop the Cadillac for speeding.  His attention was drawn to the Cadillac as it was accelerating uphill on Adams Street and traveling in excess of the posted speed limit.  Additionally, he observed the Cadillac weave out of and back into its lane without signaling a lane change, without completing the lane change, and without any circumstances to justify this driving maneuver.  There was no other traffic on Adams Street to distract the officer's attention or to explain the Cadillac's traffic violations.  Based on either or both of these observed traffic violations, Officer Ming had reasonable suspicion to stop the Cadillac.

**SEARCH AND SEIZURE OF THE DEFENDANT'S PERSON**

Officer safety during a traffic stop is a "legitimate and weighty" concern.  *United States v. Dennison*, 410 F.3d 1203, 1211 (10th Cir.), *cert. denied*, 126 S. Ct. 468 (2005).  The Tenth Circuit has noted how officer safety is implicated in all traffic stops and how courts have been balancing the competing interests in that setting:

An officer in today's reality has an objective, reasonable basis to fear for his or her life every time a motorist is stopped. Every traffic stop, after all, is a confrontation. The motorist must suspend his or her plans and anticipates receiving a fine and perhaps even a jail term. That expectation becomes even more real when the motorist or a passenger knows there are outstanding arrest warrants or current criminal activity that may be discovered during the course of the stop. Resort to a loaded weapon is an increasingly plausible option for many such motorists to escape those consequences, and the officer, when stopping a car on a routine traffic stop never knows in advance which motorists have that option by virtue of possession of a loaded weapon in the car.

In balancing the interests in this case, we are guided by other situations in which federal courts have allowed considerations of officer safety to outweigh fairly intrusive conduct during a traffic stop. Thus, during a routine traffic stop, an officer may order the driver and passengers out of the vehicle. [*Pennsylvania v.*]*Mimms*, 434 U.S. [106] at 110 [(1977)]; [*Maryland v.*]*Wilson*, 519 U.S. [408] at 415 [(1997)]; order the passengers to remain in the vehicle, *Rogala v. District of Columbia*, 161 F.3d 44, 53 (D.C. Cir. 1998); open the door of a vehicle with darkly tinted windows to check for weapons, [*United States v.*] *Stanfield*, 109 F.3d [976] at 981 [(4th Cir. 1997)]; order the occupants to raise their hands during the stop, *United States v. Moorefield*, 111 F.3d 10, 13, (3d Cir. 1997); and use a flashlight to check the dark interior of a car, *Texas v. Brown*, 460 U.S. 730, 739-40 (1983) (plurality opinion).

*United States v. Holt*, 264 F.3d 1215, 1223 (10th Cir. 2001) (en banc). The Tenth

Circuit has expressed the balancing test for the competing interests in these terms:

"[o]fficers may take steps to protect themselves and others provided the measures

'are not too intrusive' and 'the government's strong interest in officer safety

outweighs the motorist's interest.'" *Dennison*, 410 F.3d at 1211 (quoting *Holt*, 264

F.3d at 1221). Alternatively, "officers conducting traffic stops may 'take such

10

steps as [are] reasonably necessary to protect their personal safety.'" *United States v. Holt*, 264 F.3d at 1231.

An additional safety measure not available in routine traffic stops is a *Terry* frisk or a pat-down for weapons. *See Minnesota v. Dickerson*, 508 U.S. 366, 377 n.4 (1993). Under the Fourth Amendment, a pat-down for weapons is a search. *Terry v. Ohio*, 392 U.S. 1, 19 (1968). In *Terry*, the Supreme Court concluded that an officer may conduct a "reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual." *Id*. at 27. "The sole justification of [such a] search . . . is the protection of the police officer and others nearby, and it must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." *Terry*, 392 U.S. at 29. For the safety of himself and that of others, an officer during a traffic stop "may also 'perform a "pat-down" of a driver and any passengers upon reasonable suspicion that they may be armed and dangerous.'" *Dennison*, 410 F.3d at 1211 (quoting *Knowles v. Iowa*, 525 U.S. 113, 118 (1998)). Put another way, "[a]n officer may pat-down a suspect if the facts available to the officer would 'warrant a man of reasonable caution to believe that a frisk would be necessary to protect himself.'" *United States v. Manjarrez*, 348 F.3d 881, 886

11

(10th Cir. 2003) (quoting *United States v. McRae*, 81 F.3d 1528, 1536 (10th Cir. 1996)), *cert. denied*, 541 U.S. 911 (2004).  This limited search has as its purpose not the discovery of evidence but the officer's security to pursue the investigation "'without fear of violence.'"  *United States v. Manjarrez*, 348 F.3d at 886-87 (quoting *Adams v. Williams*, 407 U.S. 143, 146 (1972).  Consequently, challenges to the validity of a pat-down search turn on whether the totality of the circumstances present articulable facts which, taken together with the rational inferences from those facts, would warrant the belief in a reasonably prudent officer that the safety of himself or others was in danger.  *See Dennison*, 410 F.3d at 1212; *Manjarrez*, 348 F.3d at 887.

Reasonable suspicion requires the officer to act on "something more than an inchoate and unparticularized suspicion or hunch." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (internal quotation marks omitted).  Reasonable suspicion of criminal activity is a "likelihood of criminal activity . . . that need not rise to the level required for probable cause, and . . . falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Arvizu*, 534 U.S. 266, 274 (2002) (quotations and citations omitted); *see United States v. Hauk*, 412 F.3d 1179, 1185-89 (10th Cir. 2005) ("Reasonable suspicion may be established by information that is different in quantity or content and less reliable

12

than the information required to establish probable cause." (internal quotations and citations omitted)).  Reasonable suspicion is a "fluid concept[ ] that take[s] [its] substantive content from the particular context[ ] in which [it is] being assessed." *Ornelas v. United States*, 517 U.S. 690, 696 (1996).  Even conduct that is wholly innocent may sustain a finding of reasonable suspicion in some circumstances. *Sokolow*, 490 U.S. at 9-10.  Indeed, "[a] determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct."  *United States v. Arvizu*, 534 U.S. at 277.

Courts look at whether the totality of the circumstances show the officer had a "particularized and objective basis" for the suspicion of unlawful conduct.  *United States v. Arvizu*, 534 U.S. at 273.  In doing so, courts "may not evaluate and reject each factor in isolation."  *United States v. Gandara-Salinas*, 327 F.3d 1127, 1130 (10th Cir. 2003).  Finally, courts are "to accord deference to the officer's ability to draw on his own experience and specialized training to make inferences from and deductions about the cumulative information available to him that might well elude an untrained person."  *United States v. Johnson*, 364 F.3d 1185, 1193 (10th Cir. 2004) (citations and internal quotations omitted).

The defendant contends the information on the armed robbery was too generic and attenuated to sustain a reasonable suspicion that the defendant as a

13

passenger in the stopped Cadillac was armed and dangerous. The defendant argues the information relied upon by Officer Ming about the vehicle and suspects involved in the armed robbery is just as lacking in content and reliability as the information found inadequate in *United States v. Jones*, 998 F.2d 883 (10th Cir. 1993).

From the specific facts and circumstances established at the suppression hearing, the court finds that a reasonable officer in Officer Ming's position would have reasonably believed that the defendant may be armed and dangerous and that a frisk would be necessary to protect himself and the other officers arriving on the scene. There was a report of an armed robbery involving a dark color Cadillac and several black males received around 12:45 a.m. Within twenty minutes of that report, Officer Ming spots a dark color Cadillac speeding. The Cadillac now is only several blocks away from where the taxi cab driver first picked up the black males who later robbed him. The Cadillac is headed away from the area where the black males had fled following the robbery. Officer Ming confirmed that the Cadillac contained at least three black males prior to attempting the *Terry* frisk. Officer Ming testified that Adams Street has very light traffic on a Sunday morning around 1:05 a.m. Thus, Officer Ming had located a car that matched the make and color of a car involved in a recent armed robbery, and its

multiple occupants fit the sex and race of the multiple suspects.  This is hardly a situation, like in *Jones*, in which the officers singled out a similar make and color of a car in Albuquerque, a major population center, around 4:00 p.m. on a weekday afternoon.  The presence of a dark color Cadillac containing at least three black males speeding in a direction away from the robbery area on a Sunday morning around 1:05 a.m. in a lightly-driven area of Topeka, Kansas, known for criminal activity, bears little resemblance to the evidence labeled as "flimsy" by the panel in *Jones.*

Second, the Cadillac was operated in a way that increased Officer Ming's suspicion.  Upon following the Cadillac, Ming observed it swerve between the lanes.  He testified that he believed the swerving was due to the driver's attention being drawn to the law enforcement car in his rearview mirror.  Once the emergency lights were activated, the Cadillac did not pull over immediately.  The Cadillac instead traveled slowly next to the curb for almost forty yards.  Officer Ming testified such a driving maneuver increased his suspicion that the Cadillac's occupants could be hiding evidence of illegal conduct, accessing weapons, or preparing to flee.  This necessarily heightened Officer Ming's apprehension for his safety.

Officer Ming testified his apprehension was reduced after the Cadillac

15

eventually stopped, the driver was cooperative, and the consensual patdown search of the driver revealed nothing.  His apprehension, however, increased again when the defendant was argumentative and hesitant in cooperating with the Officer's request to step to the rear of the car and to place his hands on the trunk.  Officer Ming said the defendant's attitude and physical size raised concerns for his safety.

Looking at the totality of the circumstances–the matching descriptions to a recent armed robbery, the time of night and the absence of other traffic, the general location of the stop, the suspicious driving of the car, and the defendant's own conduct–the court concludes Officer Ming had reasonable, articulable suspicion that the defendant as an occupant of the stopped vehicle may be armed and dangerous and that a *Terry* frisk would be necessary to protect himself.  The defendant's motion to suppress is denied.

IT IS THEREFORE ORDERED that the defendant's pretrial motion to suppress evidence found in the search and seizure of his person on August 29, 2005, (Dk. 15) is denied.

Dated this 21st day of March, 2006, Topeka, Kansas.


s/ Sam A. Crow
Sam A. Crow, U.S. District Senior Judge